William S. Eubanks II
Eubanks & Associates, LLC
1331 H Street, NW, Suite 902
Washington, DC 20005
DC Bar No. 987036
Bill@EubanksLegal.com
(970) 703-6060

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity;<br>   Maricopa Audubon Society;<br>   Mount Graham Coalition, )<br><br>         Plaintiffs, )<br><br>   v. )<br><br>Vicki Christiansen, *Chief, U.S. Forest*<br>   *Service*; Aurelia Skipwith, *Director*,<br>   *U.S. Fish and Wildlife Service*, and<br>   David Bernhardt, *Secretary*,<br>   *U.S. Department of the Interior*,<br><br>         Defendants. ) | No. _____<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      This action challenges the United States Forest Service ("USFS") and United States Fish and Wildlife Service's ("FWS") failure to adequately protect and conserve the critically endangered Mount Graham red squirrel (*Tamiasciurus hudsonicus grahamensis*) ("Mount Graham red squirrel" or "red squirrel") on the Coronado National Forest as required by the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. With only 78 individuals found during the most recent survey, the red squirrel is teetering on the brink of extinction and now bears the somber distinction of being one of the most endangered mammals on Earth. The Mount Graham red squirrel has experienced significant population declines due to persistent threats to

1

1   its continued existence and critical habitat from human development, wildfires, and insect

2   infestations. Recently, a spate of intense wildfires on Mount Graham and consequent fire-

3   fighting measures killed roughly 75% of the entire population and reduced its numbers to less

4   than 80 remaining individuals, driving the species even further towards the precipice of

5   extinction. With the near-total destruction of its designated critical habitat in the upper elevation

6   spruce-fir forest, the few surviving squirrels have sought refuge amongst Mount Graham's lower

7   elevation mixed conifer forests, primarily in the Columbine area of the Ash Creek drainage.

8   Though not included in the currently designated Critical Habitat, FWS has, since 1988,

9   recognized the Columbine area of the Ash Creek drainage as vital to the red squirrel's survival.

10        2.        Despite the recent stunning collapse of the Mount Graham red squirrel population,

11   USFS and FWS have failed to take the steps required by the ESA to ensure the species' survival

12   and recovery. Specifically, USFS and FWS have failed to: (1) reinitiate formal consultation

13   regarding the impacts that recreational summer homes, located in the remaining canopied habitat

14   upon which the red squirrel now relies, are having and will continue to have on the species'

15   severely depleted numbers; (2) engage in any form of consultation regarding the impacts that an

16   abandoned recreational camp, found in the same area, has had and will continue to have on the

17   red squirrel; and (3) implement measures that FWS has for over thirty years found essential to

18   the species' survival. Without completing the consultation required by the ESA, which both

19   agencies have conceded is necessary, ongoing use and infrastructure occupation of National

20   Forest System lands at either location violates USFS's substantive duty to safeguard against

21   jeopardizing the Mount Graham red squirrel, and constitutes an irretrievable commitment of

22   agency resources prohibited by Section 7(d) of the ESA. In addition, the infrastructure associated

23   with the recreational camp—abandoned since 2017—occupies National Forest lands without a

valid Special Use Permit, in violation of the Organic Act of 1897, 16 U.S.C. § 551; the Multiple-Use and Sustained Yield Act ("MUSYA"), 16 U.S.C. §§ 528–531; the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 472a, 521b, 1600-1614; and USFS's implementing regulations.

3.      For the reasons set forth below, USFS and FWS have violated the ESA, its implementing regulations, and the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and USFS has violated the Organic Act, MUSYA, NFMA, and its own regulations. Additionally, the agencies have acted in a manner that is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," and "without observance of procedure required by law" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (D). Alternatively, the Forest Service and FWS's failure to take certain legally required actions constitutes agency action that has been "unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Accordingly, operation of the recreational facilities in the Ash Creek drainage must be immediately enjoined, the agencies' decisions implementing such activities should be vacated and remanded, and the agencies should be ordered to immediately engage in consultation, as the agencies themselves have acknowledged is necessary. 16 U.S.C. § 1540(g); 5 U.S.C. § 706.

**JURISDICTION**

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

**PARTIES**

5.      Plaintiff Center for Biological Diversity ("the Center") is a non-profit 501(c)(3) corporation headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center works through science, law, and policy to secure a future for all species, great or

small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues throughout the United States and the world, including protection of plant and animal species from the impacts of climate change. In addition to more than 625,000 supporters and online activists, the Center has more than 70,000 members and more than 1.7 million supporters throughout the United States and the world. The Center brings this action on its own institutional behalf and on behalf of its staff and its members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities concerning the Mount Graham red squirrel and its habitat harmed by the decisions challenged in this case.

6.      Plaintiff Maricopa Audubon Society is a non-profit 501(c)(3) corporation dedicated to the enjoyment of birds and other wildlife with a primary focus on protection through fellowship, education, and community involvement. Maricopa Audubon is a chapter of the National Audubon Society. Maricopa Audubon has over 2,300 members, primarily in central Arizona. Maricopa Audubon Society has played a central role in protecting endangered species in the Southwest through public education efforts, field surveys, public field trips, and position papers.

7.      Plaintiff Mount Graham Coalition, Inc., ("the Coalition") is an international non-profit organization dedicated to the ecological preservation of Mount Graham, other southwestern mountains, riparian areas, and deserts in the region. The Coalition's mission is to provide educational and technical assistance to its members and the general public so that they may protect the few remaining natural areas for those plants and animals that exist there, for the sacred nature of these areas, and for the enjoyment of all. The Coalition has been active in the protection of Mount Graham—*Dził Nchaa Si'An* (the "Big Seated Mountain")—since 1985.

8.      Plaintiffs' members use and enjoy the Coronado National Forest for a variety of purposes, including hiking, fishing, camping, viewing and photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Plaintiffs' members derive scientific, aesthetic, recreational, vocational, and spiritual benefits from the Coronado National Forest, including the areas and habitat where the critically endangered Mount Graham red squirrel is found.

9.      Plaintiffs' members intend to, and have plans to, continue to use and enjoy the Coronado National Forest frequently and on an ongoing basis in the future, including during the summer and fall of 2020. The areas of the Coronado National Forest that Plaintiffs' members intend to continue to use and enjoy include specific areas where the Mount Graham red squirrel is likely to be found, as well in areas designated as critical habitat for the species.

10.     The health, aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of the Plaintiffs and their members have been and will continue to be adversely affected and irreparably injured if Defendants' ongoing violations of the ESA, Organic Act, NFMA, MUSYA, and the APA continue. The relief sought will redress Plaintiffs' and their members' injuries by ensuring that the Mount Graham red squirrel does not go extinct and by ensuring that the species' recovery prospects are not impaired or jeopardized.

11.     Defendant Vicki Christiansen is the Chief of USFS, an agency within the U.S. Department of Agriculture, and is directly responsible for the supervision, management, and control of the agency, including its administration of the Coronado National Forest. Accordingly, she is responsible for overseeing USFS's actions challenged in this lawsuit. She is sued in her official capacity.

12.     Defendant Aurelia Skipwith is the Director of FWS, an agency within the U.S. Department of the Interior, and is directly responsible for the supervision, management, and control of the agency, including its administration of the ESA. Accordingly, she is responsible for overseeing FWS's actions challenged in this lawsuit. She is sued in her official capacity.

13.     Defendant David Bernhardt is the Secretary of the U.S. Department of the Interior and is ultimately responsible for overseeing the work of FWS, an agency within the Department of the Interior. He is sued in his official capacity.

14.     Defendant FWS is responsible for administering the ESA. Accordingly, the agency is ultimately responsible for the decisions challenged here.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     Endangered Species Act

15.     Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. As such, the ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

16.     Under the ESA, a species may be listed as endangered or threatened. An endangered species—a status which is reserved for species in the most perilous condition—is

1    one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C.

2    § 1532(6).

3        17.    Section 9 of the ESA makes it unlawful for any person to "take" an endangered

4    species without express authorization from FWS. 16 U.S.C. § 1538(a)(1). "Take" means "to

5    harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in

6    any such conduct." 16 U.S.C. § 1532(19). The term "harm" is further defined by FWS

7    regulations to encompass habitat modification or degradation that injures an endangered species

8    by significantly impairing essential behavioral patterns, including breeding, feeding, or

9    sheltering, *see* 50 C.F.R. § 17.3, and "harass" is defined as "an intentional or negligent act or

10   omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to

11   significantly disrupt normal behavioral patterns which include, but are not limited to, breeding,

12   feeding or sheltering." *Id.*

13       18.    Section 7(a)(1) of the ESA directs all federal agencies, in consultation with the

14   Secretary of Interior, to "utilize their authorities . . . by carrying out programs for the

15   conservation of endangered species." 16 U.S.C. § 1536(a)(1). "Conservation" means "to use and

16   the use of all methods and procedures which are necessary to bring any endangered species . . .

17   to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.*

18   § 1532(3).

19       19.    Section 7(a)(2) of the ESA further requires all federal agencies to "insure that any

20   action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

21   continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this

22   obligation, before undertaking any action that may have direct or indirect effects on listed

23   species, an action agency must engage in consultation with FWS in order to evaluate the impact

7

of the proposed action. *See id.* § 1536(a). FWS has defined the term "action" for the purposes of Section 7 broadly to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control," *id.* § 402.03.

20. The purpose of consultation is to ensure that the action at issue "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated] habitat of such species." 16 U.S.C. § 1536(a)(2). As defined by the ESA's implementing regulations, an action will cause jeopardy to a listed species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Notwithstanding this definition of jeopardy, during consultation the action agency and FWS must consider not only the loss of critical habitat necessary to survival, but also the loss of critical habitat necessary to recover a listed species. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 387 F.3d 968, 1071 (9th Cir. 2004). The evaluation of the effects of the proposed action on listed species during consultation must use "the best scientific . . . data available." 16 U.S.C. § 1536(a)(2).

21. Consultation under Section 7(a)(2) may be "formal" or "informal" in nature. Informal consultation is "an optional process" consisting of all correspondence between the action agency and FWS, which is designed to assist the action agency, rather than FWS, in determining whether formal consultation is required. *See* 50 C.F.R. § 402.02. During an informal consultation, the action agency requests information from the FWS as to whether any listed species may be present in the action area. If listed species may be present, Section 7(c) of the

1   ESA requires the action agency to prepare and submit to FWS a "biological assessment" ("BA")

2   that evaluates the potential effects of the action on listed species and critical habitat. As part of

3   the BA, the action agency must make a finding as to whether the proposed action may affect

4   listed species and submit the BA to FWS for review and potential concurrence with its finding.

5   16 U.S.C. § 1536(c). If the action agency finds that the proposed action "may affect, but is not

6   likely to adversely affect" any listed species or critical habitat, and FWS concurs with this

7   finding, then the consultation process is terminated. 50 C.F.R. § 402.14(b).

8        22.     On the other hand, if the action agency finds that the proposed action "may

9   affect" listed species or critical habitat by having any potentially adverse effect that may occur

10  and is not insignificant or discountable, then formal consultation is required. *See* 50 C.F.R.

11  § 402.11. Following completion of the BA, the action agency must initiate formal consultation

12  through a written request to FWS. *See* 50 C.F.R. § 402.14(c). The result of a formal consultation

13  is the preparation of a biological opinion ("BiOp") by FWS, which is a compilation and analysis

14  of the best available scientific data on the status of the species and how it would be affected by

15  the proposed action. When preparing a BiOp, FWS must: (1) "review all relevant information;"

16  (2) "evaluate the current status of the listed species;" and (3) "evaluate the effects of the action

17  and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). As such, a

18  BiOp must include a description of the proposed action, a review of the status of the species and

19  critical habitat, a discussion of the environmental baseline, and an analysis of the direct and

20  indirect effects of the proposed action and the cumulative effects of reasonably certain future

21  state, tribal, local, and private actions. *Id.*

22       23.     At the end of the formal consultation process, FWS issues either a no-jeopardy or

23  a jeopardy BiOp. With a no-jeopardy BiOp, FWS determines that the proposed action is not

likely to jeopardize the continued existence of listed species or adversely modify critical habitat. If, as part of a no-jeopardy BiOp, FWS determines that the proposed action will nevertheless result in the incidental taking of listed species, then FWS must provide the action agency with a written Incidental Take Statement ("ITS") specifying the "impact of such incidental taking on the species" and "any reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact" and setting forth "the terms and conditions . . . that must be complied with by the [action] agency . . . to implement [those measures]." 16 U.S.C. § 1536(b)(4). Take in excess of that authorized by the ITS violates the ESA's prohibition on take. *Id.* § 1538. With a jeopardy BiOp, FWS determines that the proposed action will jeopardize the continued existence of listed species or destroy or adversely modify critical habitat. In a jeopardy BiOp, FWS may offer the action agency reasonable and prudent alternatives ("RPAs") to the proposed action that will avoid jeopardy to a listed species or adverse habitat modification, if they exist. *Id.* § 1536(b)(3)(A).

24.     Where a BiOp has been issued and "discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency is required to reinitiate consultation with FWS in certain circumstances, including: (1) "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or (2) "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16(a)(2), (3). Additionally, consultation must be reinitiated if, over the course of the action, the amount or extent of incidental take is exceeded. *Id.* § 402.16(a)(1).

25.     The ESA provides that agencies must hold action in abeyance until any legally required consultation is complete. Section 7(d) of the ESA prohibits an action agency from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate [Section] (a)(2)." 16 U.S.C. § 1536(d). "This prohibition . . . continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. The purpose of this requirement is to ensure that the status quo will be maintained during the consultation process. *See Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir.1992) ("In order to maintain the status quo, section 7(d) forbids "irreversible or irretrievable commitment of resources" during the consultation period").

B.     **Organic Act of 1897, Multiple-Use and Sustained Yield Act, and National Forest Management Act**

26.     With the Organic Act of 1897, Congress directed the Forest Service to "regulate the[] occupancy and use [of National Forest System lands] and to preserve the forests thereon from destruction." 16 U.S.C. § 551. In 1960, Congress enacted the MUSYA, which instructed the agency to balance the competing uses for outdoor recreation, range, timber, watershed, and wildlife purposes, and provide for the multiple use and sustained yield of the various products and services provided by National Forest System lands. *Id.* §§ 475, 528, 529. In 1976, Congress passed NFMA, which affirmed the Forest Service's responsibility as "a leader in assuring that the Nation maintains a natural resource conservation posture that will meet the requirements of our people in perpetuity." *Id.* § 1600(6). While these statutes grant discretion in managing National Forest System lands—including through the issuance of special use authorizations— they also underscore the Forest Service's duty to ensure the protection of National Forest System resources, including the wildlife that resides thereon. *See id.* § 1610 (defining "renewable

11

1  resources" to include the use and occupancy of National Forest System lands for wildlife

2  management purposes).

3        27.    In the MUSYA and NFMA, Congress set forth factors that USFS must consider

4  when administering the National Forest System and its resources. When issuing site-specific

5  management decisions, USFS must take into account its statutory obligations to: provide for

6  healthy and diverse forest ecosystems; ensure the sustained yield of forest resources, including

7  wildlife; and balance environmental and commercial considerations. *Id.* §§ 528, 529,

8  1604(g)(3)(B).

9        28.    NFMA and its regulations require USFS to develop and implement land and

10  resource management plans for units of the National Forest System. 16 U.S.C. § 1604(a). These

11  plans must reflect the agency's consideration of its statutory mandates to develop and administer

12  the national forests to secure water flows and provide a continuous supply of timber, and provide

13  for a "diversity of plant and animal communities based on the suitability and capability" of the

14  specific forest unit to enable the agency to meet its multiple-use objectives. *Id.* § 1604(g)(3)(B).

15        29.    Pursuant to its enabling statutes, USFS has promulgated regulations governing

16  special use permits, which authorize the "use or occupancy of National Forest System lands and

17  specif[y] the terms and conditions under which the use or occupancy may occur." 36 C.F.R. §

18  251.51. "All uses of National Forest System lands, improvements, and resources, except those"

19  enumerated under USFS regulations "are designated 'special uses.'" *Id.* § 251.50(a). Before a

20  special use may be conducted on a National Forest, "individuals or entities must submit a

21  proposal to the authorized officer and must obtain a special use authorization from the authorized

22  officer, unless that requirement" has been waived. *Id.*

1       30.     USFS's special use regulations provide minimum requirements that each

2    applicant must meet. 36 C.F.R. § 251.54. Specifically, USFS must ensure that: "the proposed use

3    is consistent with" applicable federal "laws, regulations, orders, and policies," including the

4    ESA. *Id.* § 251.54(e)(1)(i)–(iii). Assuming an application for a special use permit satisfies these

5    threshold criteria, USFS is nevertheless required to "reject any proposal" for a special use permit

6    that "would be inconsistent or incompatible with the purposes for which the lands are managed,"

7    or "would not be in the public interest." *Id.* § 251.54(e)(5)(i)–(ii). Where a permit has been

8    issued, USFS's implementing regulations require that the permit's terms and conditions

9    "[m]inimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise

10    protect the environment." *Id.* § 251.56(a)(1)(i).

11       **C.**      **<u>Administrative Procedure Act</u>**

12       31.     The APA, 5 U.S.C. §§ 701–706, provides for judicial review of agency action.

13    Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings,

14    and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in

15    accordance with law." *Id.* § 706(2)(A). An agency action is arbitrary and capricious if the agency

16    "relied on factors which Congress has not intended it to consider, entirely failed to consider an

17    important aspect of the problem, offered an explanation for its decision that runs counter to the

18    evidence before the agency," or if the agency's decision "is so implausible that it could not be

19    ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v.*

20    *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When reviewing agency action under the

21    APA, a court must ensure that the agency reviewed the relevant data and articulated a

22    satisfactory explanation establishing a "rational connection between the facts found and the

1    choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision

2    arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

3       32.    Under the APA, a reviewing court must also set aside agency action, findings, and

4    conclusions found to be without observance of procedure required by law. *Id.* § 706(2)(D).

5    Additionally, reviewing courts may "compel agency action unlawfully withheld or unreasonably

6    delayed." *Id.*§ 706(1).

7                              **FACTUAL BACKGROUND**

8    **A.    The Mount Graham Red Squirrel Background, Listing Status, and**
9         **Critical Habitat**
10
11      33.    The Mount Graham red squirrel is a small, grayish-brown arboreal subspecies of

12    the American red squirrel. Smaller than most other subspecies of red squirrel, the Mount Graham

13    red squirrel is characterized by the tinged rusty or yellowish stripe running along the centerline

14    of its back. The squirrel's diet consists primarily of conifer seeds and, during the winter, seed-

15    bearing cones that it has stored in middens.[1]

---

[1] Middens are areas where the red squirrels cache spruce, fir, and pine cones. Middens also typically include cone scales and other debris left behind from feeding. These sites accumulate to considerable depths, creating cool microenvironments for seed storage. The Mount Graham red squirrel shows high site fidelity to a few middens, which are the focal point of an individual squirrel's territory, and they guard them against competitors vigorously.

© Robin Silver

*The above photograph, captured on August 18, 1989, depicts a female Mount Graham Red Squirrel on Emerald Peak, the present-day site of the University of Arizona's Large Binocular Telescope.*

34.     The entire population of the Mount Graham red squirrel is restricted to lands located within the Coronado National Forest—specifically, the Pinaleño Mountains in Graham County, Arizona. Since the last ice age nearly 10,000 years ago, the red squirrel has been isolated from other native squirrel subspecies. Within its remarkably limited range, the Mount Graham red squirrel has relied on two different canopied-forest assemblages. Historically, the red squirrel was found at higher elevations in and around mixed spruce-fir forests, especially those comprised of Englemann spruce and corkbark fir. At present, however, largely due to the destruction or degradation of higher-elevation spruce-fir habitat, the species is almost exclusively found at lower elevations in mixed conifer forests dominated by old-growth Douglas fir and/or white fir. The few remaining red squirrels are limited to four areas in the Coronado National Forest that bear these lower elevation forest assemblages: the Grant Hill area, the Riggs Lake area, Turkey Flat, and Columbine. To date, none of these areas has been designated as critical

15

1  habitat.[2] The latter area, the Columbine area, located in the Ash Creek Drainage, is home to the

2  Old Columbine summer home tract and the Arizona Church of Christ Bible Camp.

3    35.    The Mount Graham red squirrel was first described in 1884, at which point it was

4  considered common. However, largely due to logging operations and road building in the

5  Pinaleño Mountains between the 1880s and 1930s, the red squirrel suffered dramatic population

6  declines. By the 1950s, the species was considered rare. In 1968, the Mount Graham red squirrel

7  was presumed to be extinct. In the early 1970s, however, officials from USFS and the Arizona

8  Game and Fish Department reported that at least four red squirrels were surviving in the wild.

9  By 1988, researchers concluded that the entire red squirrel population amounted to

10  approximately 280 individuals.

11    36.    FWS proposed the Mount Graham red squirrel for listing as endangered under the

12  ESA on May 21, 1986, citing a century-long decline in the species' habitat. Proposed

13  Determination of Endangered Status and Critical Habitat for the Mount Graham Red Squirrel, 51

14  Fed. Reg. 18,630, 18,630 (May 21, 1986). FWS then listed the Mount Graham red squirrel as

15  endangered on June 3, 1987. Determination of Endangered Status for the Mount Graham Red

16  Squirrel, 52 Fed. Reg. 20,994, 20,994–99 (June 3, 1987). FWS based the final listing

17  determination on a number of factors, including the proposed construction of an astrophysical

18  observatory, the prevalence of annual forest fires in the Coronado National Forest, road

---

[2] On April 16, 2019, Plaintiffs filed suit in this Court against FWS to compel agency action on their December 14, 2017 petition to revise existing critical habitat for the Mount Graham red squirrel by including the Grant Hill, Riggs Lake, Turkey Flat, and Columbine areas as critical habitat under the ESA. *See* ECF No. 1, *Center for Biological Diversity v. Bernhardt*, 4:19-cv-00218-RCC (D. Ariz. April 16, 2019). The parties agreed to settle the matter, and FWS has subsequently issued a 90-day finding on the petition. FWS found that the petition to list these areas as critical habitat "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 90-Day Findings for Three Species, 84 Fed. Reg. 46927, 46928 (Sept. 6, 2019). To date, the petition remains under review.

1    construction projects, and recreational development within the species' known habitat. *Id.* at

2    20,997. These factors, coupled with the red squirrel's "restricted population size and

3    distribution," led FWS to conclude that the species "is particularly vulnerable to any disturbance

4    that might bring about further declines in its already precariously low numbers and weakening of

5    genetic viability." *Id.* at 20,998.

6         37.    On January 5, 1990, FWS designated critical habitat for the Mount Graham red

7    squirrel. Designation of Critical Habitat for the Endangered *Tamiasciurus hudsonicus*

8    *grahamensis* (Mount Graham Red Squirrel), 55 Fed. Reg. 425, 425–429 (Jan. 5, 1990). The

9    designated habitat includes three areas in the Pinaleño Mountains: (1) the area above 10,000 feet

10   surrounding Hawk and Plain View peaks and a portion of the area above 9,800 feet; (2) the

11   north-facing slopes of Heliograph Peak above 9,200 feet; and (3) the east-facing slope of Webb

12   Peak above 9,700 feet. FWS selected these areas, which at the time contained 70% of all known

13   red squirrel middens, due to the presence of mature spruce-fir forest—i.e., the species' primary

14   and preferred habitat at higher elevations. FWS did not designate as critical habitat the Mount

15   Graham red squirrel's habitat at lower elevations—that containing primarily old growth Douglas

16   fir and/or white fir—which is the only area in which the Mount Graham red squirrel persists

17   today.

18        38.    Today, by any metric the Mount Graham red squirrel is teetering on the brink of

19   extinction. Surveys conducted by FWS in the wake of a 2017 forest fire "showed a significant

20   decline" in the Mount Graham red squirrel's population, with biologists projecting that "*only 35*

21   *squirrels*" remained in the wild. FWS, *Surveys of Endangered Mount Graham Red Squirrel*

22   *Show Decline Due to Impacts from the Frye Fire* (Oct. 17, 2017), https://bit.ly/3gIsZ7Z

23   (emphasis added). More recent surveys, concluded in November 2019, estimate that the total

1   remaining population of the Mount Graham red squirrel is approximately 78 individuals. The

2   species, therefore, continues to be listed as endangered under the ESA. FWS has recognized that

3   "[t]he greatest overarching threat to the Mount Graham red squirrel is the loss or potential loss of

4   its habitat." FWS, Draft Mount Graham Red Squirrel Recovery Plan ("Recovery Plan") at 25

5   (May 2011). Indeed, FWS has deemed it essential that management actions in the Coronado

6   National Forest "address the threats of destruction, modification, and/or curtailment of the

7   squirrel's habitat or range, including threats of catastrophic, stand-replacing wildfire, insect and

8   disease damage, and habitat loss due to human developments." *Id.* at 37. Accordingly, the

9   primary objective (i.e., "Objective 1") of FWS's Recovery Plan for the species is to "[r]estore

10  and maintain sufficient Mount Graham red squirrel habitat to ensure the species' survival . . . ."

11  *Id*. at v.

12  **B.    The Mount Graham International Observatory, Initial Destruction of the**
13  **Mount Graham Red Squirrel's Critical Habitat, and FWS's Recommended**
14  **Mitigation Measures**

15
16       39.    In 1984, an international consortium of astrophysicists—led by the University of

17  Arizona—proposed constructing on Mount Graham the largest array of telescopes anywhere in

18  the world. Cognizant of the potential devastation that the observatory, known as the Mount

19  Graham International Observatory ("MGIO"), would have on the red squirrel's already

20  precariously fragile population, USFS and FWS undertook formal consultation on the University

21  of Arizona's preferred alternative—siting three telescopes on High Peak and four telescopes on

22  Emerald Peak, the latter of which contained, at the time, the most abundant red squirrel habitat.

23  FWS issued its BiOp in 1988, concluding that construction and operation of the MGIO would

24  likely jeopardize the continued existence of the Mount Graham red squirrel. *See* FWS, Biological

25  Opinion on the Coronado National Forest Plan and the Mount Graham Astrophysical Area Plan

("1988 BiOp") at 4 (July 14, 1988). Despite that finding, FWS nonetheless proposed three "reasonable and prudent alternatives," one of which, Alternative 3, contemplated the construction of telescopes on Emerald Peak. Notably, FWS's Alternative 3 concluded that because Emerald Peak was a vital portion of the red squirrel's already severely diminished habitat, mitigation measures must be undertaken to ensure the species' survival. The mitigation measures proposed by FWS noted that it was "imperative that habitat restoration via reforestation be accelerated" in alternative locations that could support stable red squirrel populations, including those portions of its range located at a lower elevation. *Id.* at 33. FWS observed that "[t]he summer homes at Columbine and the Arizona Bible Camp are along a forest road that leads into the Ash Creek drainage, an area that has considerable potential for red squirrels." *Id.* at 28. Thus, "[r]emoval of the Bible Camp and summer homes would enable those acreages (2.5 and 14.5 respectively) to be incorporated into forest restoration plans for the area." *Id.* Although those two locations are not located within the spruce-fir assemblages typical of the red squirrel's critical habitat, FWS determined that "[r]emoval of the Bible Camp and summer homes and subsequent restoration represents the best opportunity to regain previously lost habitat outside the refugium." *Id.* at 29.

40.     Threatened by widespread public opposition to the telescope project and acknowledged risk to the red squirrel—and frustrated by perceived delays associated with the legally required consultation between USFS and FWS—the University of Arizona lobbied Congress to intervene to circumvent environmental and religious protection laws problematic to the University of Arizona's development designs.[3] Congress responded in 1988 by enacting the

---

[3] The Emerald Peak area specifically, and the telescope project site generally, are centrally important to the traditional religious beliefs of the Western Apache.

Arizona-Idaho Conservation Act ("AICA"), Pub. L. No. 100-696, 102 Stat. 4571 (Nov. 18, 1988). Through the AICA, Congress required USFS to adopt Alternative 3 of the 1988 BiOp, i.e., construction of telescopes on Emerald Peak, including all roads and associated support facilities. With respect to FWS's proposed mitigation measures, however, Section 605 of AICA delayed the removal of the Bible Camp and summer homes, further providing that:

> Prior to the termination, nonrenewal or modification of those Special Use Authorizations for the areas noted above, [USFS] shall, with the assistance of [FWS], conduct a biological study to determine the effects of such special use authorizations upon the Mount Graham red squirrel and other threatened or endangered species. . . . In addition to the biological study, [USFS] shall initiate consultation with [FWS] pursuant to section 7(a)(2) of the Endangered Species Act regarding the termination, nonrenewal, extension or modification of the special use authorizations.

41.     The AICA was met with strenuous opposition, giving rise to numerous legal challenges, including three appeals to U.S. Court of Appeals for the Ninth Circuit. *See Mt. Graham Red Squirrel v. Yeutter*, 930 F.2d 703 (9th Cir. 1991); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992); *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568 (9th Cir. 1993). Although the Ninth Circuit ultimately rejected those challenges, it noted that:

> The possible extinction of an endangered species is not a threat that we take lightly. If the Mount Graham Red Squirrel becomes extinct as a result of the astrophysical research project, then the new telescopes will not represent an unqualified step forward in our quest for greater knowledge. As we expand our horizons by building bigger and better telescopes, we would do well to remember that we also have much to learn from the plant and animal life in the world around us. By contributing to the extinction of an endangered species, we limit our horizons at least as seriously as we do by delaying or even disallowing the construction of new telescopes . . . We can only hope that Congress's decision will prove to be a wise one.

*Madigan*, 954 F.2d at 1463. Thereafter, three telescopes, along with roads and support infrastructure, were constructed on and near Emerald Peak.

20

### C.   <u>Post-Construction Depletion of the Mount Graham Red Squirrel's Habitat</u>

42.     Since the MGIO's construction on Mount Graham, the red squirrel has suffered even further declines. In 1996, for instance, biologists began to document the first signs of red squirrel mortality due to invasive insects. Those mortalities were particularly notable in the spruce-fir complexes at higher elevations. In 2005, researchers concluded that "[i]nsect mortality, along with the effects of drought over the last several years, have rendered most, if not all, of the area within the boundaries of [Mount Graham red squirrel] critical habitat useless to [Mount Graham red squirrels]." FWS, Biological Opinion on Fire-Suppression Actions Associated with the Nuttall-Gibson Complex Wildfire ("Nuttall-Gibson BiOp") at 31 (June 8, 2007).

43.     In addition to the first insect-related red squirrel mortalities, 1996 saw the first major post-MGIO construction wildfire—the Clark Peak Fire. That fire started in April 1996 in the Riggs Lake area and burned roughly 6,500 acres until it was eventually contained on May 9, 1996. FWS's evaluation of the fire estimated that 15 red squirrels were taken, 21% of its critical habitat was lost, and 50% of the middens in the burn path were destroyed. Nuttall-Gibson BiOp at 33.

44.     In 2004, two more fires broke out on the Coronado National Forest—the Gibson and Nuttall fires. Together, these wildfires came to be called the Nuttall-Gibson Complex Fire, which burned nearly 29,900 acres of oak woodland, ponderosa pine, mixed-conifer, and spruce-fir forest. 1,323 acres of designated red squirrel critical habitat were located within the fire perimeter; however, because the species had "been eliminated from much of the spruce-fir forest devastated by insect damage and fire," only 786 of acres were considered by FWS to be "suitable [red squirrel] habitat." Nuttall-Gibson BiOp at 35. According to FWS's retrospective analysis of

1   the Nuttall-Gibson Complex Wildfire, "[a]pproximately 27 percent (214 of 786 acres) of the

2   critical habitat was categorized as having moderate-severity burn effects. The same percentage

3   (27 percent) of critical habitat was categorized as high-severity burn effects (212 of 786 acres)."

4   *Id.* Thus, the Nuttall-Gibson Complex Wildfire was responsible for the destruction of 54% of the

5   Mount Graham red squirrel's remaining critical habitat. FWS therefore concluded that "[w]ith

6   the loss of most of the spruce-fir forest, the mixed conifer zone"—i.e., the habitat-type located in

7   and around the Bible Camp and the Old Columbine summer homes—"is now much more

8   important for survival of the [Mount Graham red squirrel]; however, most of that forest type is

9   not designated as critical habitat." *Id.*

10        45.     Upon information and belief, firefighting efforts during the Nuttall-Gibson

11   Complex Wildfire unnecessarily prioritized protection of the MGIO over the few remaining

12   acres of suitable red squirrel habitat. Indeed, subsequent evaluations by USFS have concluded

13   that "the MGIO and other modern developments on [Mount Graham] have precipitated

14   aggressive firefighting techniques, and inhibited the restoration of the natural ecosystem

15   processes." USFS, Final Environmental Impact Statement for the Pinaleño Ecosystem

16   Restoration Project at 176 (Feb. 2010).

17        46.     In 2017, yet another wildfire broke out on Mount Graham. That fire, known as the

18   "Frye Fire," proved to be historic, consuming approximately 48,443 acres on and around Mount

19   Graham. Although a more thorough analysis is not yet available, recent field surveys indicate the

20   Frye Fire's impacts on the Mount Graham red squirrel have been devastating. Before the Frye

21   Fire, FWS projected the red squirrel's population to range between 199 and 346 individuals.

22   Immediately after the fire, however, FWS estimated that only 35 individuals remained. Although

23   a 2019 survey placed the species' population at around 78 individuals, that number still indicates

1   that 61-78% of the *entire* species was lost to the Frye Fire. Even setting aside those individual

2   red squirrels lost directly to the Frye Fire, the effects of that event will inevitably echo far

3   beyond the fire itself; as FWS itself recognized in the wake of the Nuttall-Gibson Complex

4   Wildfire:

5   > [S]mall populations can exhibit genetic or demographic problems that further
6   > compromise the ability of the subspecies to survive. Low genetic variability in
7   > small populations is a concern because deleterious alleles are expressed more
8   > frequently, disease resistance might be compromised, and there is little capacity for
9   > evolutionary change in response to environmental change.
10
11   Nuttall-Gibson BiOp at 30.
12
13       47.    Upon information and belief, USFS's fire suppression efforts preceding

14   and in response to the Frye Fire caused significant red squirrel mortality and habitat loss

15   in the Ash Creek drainage. USFS has consistently oriented its fire management policy on

16   Mount Graham towards the preservation of man-made structures, such as those on the

17   Old Columbine recreational summer homes tract and the recreational Bible Camp,

18   thereby suppressing natural fire cycles and leading to the build-up of fuel in the areas in

19   and around the Ash Creek drainage. When massive wildfires, such as the Frye Fire,

20   overrun USFS's containment measures, the agency's fire management policy causes

21   more intense and damaging burns within the mixed conifer habitat relied upon by the

22   Mount Graham red squirrel, yielding excessive take of this extremely vulnerable species.

23   As explained by USFS, this species is "at risk from the effects of catastrophic wildland

24   fire, which continues to occur on the mountain because [of] fire suppression in [red

25   squirrel] habitat at Old Columbine and other man-made facilities" in the vicinity, such as

26   the Bible Camp. USFS, Final Environmental Impact Statement ("Columbine FEIS") at 8

27   (Sept. 2014). Thus, USFS has conceded that "[f]ire suppression has and will continue to

1    be an impediment to the return of a frequent, low-intensity, natural fire cycle to the

2    ecosystem." *Id.*

3    **D.    The Old Columbine Summer Home Tract and the Arizona**
4            **Church of Christ Bible Camp**
5
6        48.    The Old Columbine summer home tract and the Arizona Church of Christ Bible

7    Camp are both located on the Coronado National Forest in the Ash Creek drainage—an area that

8    FWS itself has deemed to have "considerable potential" for the Mount Graham red squirrel's

9    recovery, 1988 BiOp at 28, and, due to the surviving canopied mixed conifer forest, has become

10   "much more important for survival of the [species]" in light of recent wildfires. Nuttall-Gibson

11   BiOp at 33.

12                *1.   The Old Columbine Summer Home Tract*

13       49.    The Old Columbine summer home tract was first established in the 1920s and is

14   authorized to occupy National Forest System lands through special use permits issued by USFS

15   pursuant to its statutory authorities. The tract encompasses fourteen residences on roughly 25

16   acres.

17       50.    On December 31, 2008, the Special Use Permit for the Old Columbine and

18   Turkey Flat recreation residence tracts expired. In July 2005, USFS announced that it intended to

19   reissue the Special Use Permit for both tracts from January 1, 2009 to December 31, 2028.

20   Pursuant to its obligation under the National Environmental Policy Act, 42 U.S.C. §§ 4321–

21   4347, USFS prepared an Environmental Impact Statement ("EIS") to evaluate the effects of and

22   alternatives to its decision. USFS finalized its EIS in 2014. The Columbine FEIS analyzed four

23   alternatives, including USFS's preferred alternative of reissuing the Special Use Permit for both

24   the Old Columbine and Turkey Flat residential tracts. Columbine FEIS at 11–14. With respect to

25   the Mount Graham red squirrel, the Columbine FEIS conceded that:

Human presence at the recreation residences and, in general, all recreation sites on Mt. Graham, increases the probability that individual squirrels may be accidentally injured or killed. In addition, squirrels are at risk from the effects of catastrophic wildland fire, which continues to occur on the mountain because [of] fire suppression in [Mount Graham red squirrel] habitat at Old Columbine and other man-made facilities (the wildland-urban interface or WUI). Fire suppression has and will continue to be an impediment to the return of a frequent, low-intensity, natural fire cycle to the ecosystem.

*Id.* at 8. Furthermore, USFS acknowledged that "the continued presence of the residences at Old Columbine inhibits the restoration of approximately 25 acres of forest to historic conditions" that would benefit the red squirrel and promote its recovery prospects. *Id.*

51.     In connection with its proposed renewal of the Special Use Permit (and as required by Section 605(a) of AICA), USFS engaged in formal consultation with FWS pursuant to Section 7(a)(2) of the ESA. FWS issued a BiOp on August 18, 2008, concluding that "the effects of the proposed re-issuance of Special Use Permits for the Mt. Graham summerhomes at Old Columbine and Turkey Flat . . . are neither likely to jeopardize the continued existence of the [Mount Graham red squirrel], nor result in destruction or adverse modification of critical habitat." FWS, Biological Opinion on Mount Graham Summerhome Special Use Permit Residence Renewal ("Columbine BiOp"), at 17 (Aug. 18, 2008). The Columbine BiOp's jeopardy analysis was predicated upon FWS's estimate that between 199 and 346 individual red squirrels existed rangewide. *Id.* at 9. During the duration of the permit, the Incidental Take Statement included in the Columbine BiOp authorized the take of one red squirrel at the Old Columbine tract and one red squirrel at the Turkey Flat tract. *Id.* at 19. The Columbine BiOp also included a standard reinitiation notice, providing that

[R]einitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; or (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion . . . .

25

Columbine BiOp at 22.

52.     In March of 2015, USFS issued its Record of Decision ("ROD") on the Special Use Permit for the recreational residences at Old Columbine and Turkey Flat. *See* USFS, Record of Decision, New Special-Use Permits for Recreation Residences on the Safford Ranger District ("Columbine ROD") (March 2015). The ROD adopted USFS's preferred alternative, reauthorizing all existing residences and associated access roads at both Old Columbine and Turkey Flat until December 31, 2028. Columbine ROD at 6.

53.     In the summer of 2017, the Frye Fire—which decimated between 61-78% of the entire remaining red squirrel population—burned through the areas in and around both the Old Columbine and Turkey Flat residential tracts. Indeed, the fire's mosaic pattern burned "right up to the cabins at Old Columbine before suddenly shifting direction." Jon Johnson, *Mount Graham Still Recuperating at One Year Anniversary of Frye Fire Start*, Gila Herald (June 9, 2018), https://bit.ly/3gvwApX. Even setting aside the burn path of the fire itself, both Old Columbine and Turkey Flat were subjected in the wake of the fire to significant flooding caused by erosion and firefighting efforts. *Id.*

54.     Following the fire's containment in July 2017, however, USFS and FWS never reinitiated consultation as to the effects of the Old Columbine summer homes on the Mount Graham red squirrel. Those summer homes continue to be utilized, including during the summer of 2020. Upon information and belief, USFS has yet to complete a biological assessment of the impacts the recreational residences have on the now severely depleted species.

### 2.   *The Arizona Church of Christ Bible Camp*

55.     The Arizona Church of Christ Bible Camp ("Camp") began operation in the Coronado National Forest in 1966 and encompasses roughly 20 acres within the Ash Creek

1   drainage. *See* Columbine FEIS at 26. The Camp is located just over 1,200 yards away from the

2   Old Columbine Summer Home tract, connected by the same canopied, mixed conifer forest that

3   FWS has found to be crucial to the red squirrel's continued survival. The Camp's facilities

4   include "a large dining hall, generator house, shower house with a septic tank and leach field,

5   tool shed, two toilet buildings, its own water and electrical systems, six barracks buildings, and

6   four ramada shelters." Jon Johnson, *Group Looks to Keep Bible Camp on Mount Graham Open*

7   *to the Public*, Gila Herald (Nov. 20, 2019) [hereinafter *Camp*], https://bit.ly/2BcPvpq. Much of

8   that infrastructure, however, has been damaged in the post-Frye Fire flooding or is in a general

9   state of disrepair due to the Camp's infrequent use over the past 15 years. *Id.*

10       56.     Since at least August 10, 1977, the Camp has been authorized through the

11   issuance and renewal of a Special Use Permit. The most recent Special Use Permit for the Camp

12   expired on December 31, 2008. The terms and conditions of the Camp's Special Use Permit

13   provide that:

14       At the end of the term of occupancy authorized by this permit, or upon
15       abandonment, or termination for cause, Act of God or catastrophic event, or in the
16       public interest, the holder shall remove within a reasonable time all structures and
17       improvements except those owned by the United States, and shall return the site to
18       a condition approved by the authorized officer unless otherwise agreed to in writing
19       or in this permit. If the holder fails to remove all such structures or improvements
20       within a reasonable period—not to exceed, one hundred and eighty (180) days from
21       the date the authorization of occupancy is ended—the improvements shall become
22       the property of the United States, but in such event, the holder remains obligated
23       and liable for the cost of their removal and the restoration of the site.
24

25   USFS, Term Special Use Permit for Recreational Residences, Holder No. 5114/01, Type Site

26   No. 123 (Sept. 26, 1994). With respect to transferability, the permit provides that "[i]f the holder

27   through voluntary sale, transfer, enforcement of contract, foreclosure, or other legal proceeding

28   shall cease to be-the owner of the physical improvements," within the tract, the "permit *shall* be

29   terminated." *Id.* at VII.C. (emphasis added). Notwithstanding that language, the permit also

allows an authorized purchaser to assume the remainder of an existing permit term. *Id.* ("If the person to whom title to said improvements is transferred is deemed by the authorizing officer to be qualified as a holder, then such person to whom title has been transferred will be granted a new permit. Such new permit will be for the *remainder of the term of the original holder*." (emphasis added)).

57.     According to local reporting, "[t]he Church of Christ has attempted to sell the property for a number of years and no longer has the funds to maintain the site." Johnson, *Camp*, *supra*. Nevertheless, the structures, including associated access roads, remain on the Coronado National Forest without the authorization required under USFS's own regulations.

58.     Despite the expiration of the Camp's Special Use Permit more than eleven years ago, USFS has recently accepted comments on a contemplated renewal. *See* USFS, *Arizona Church of Christ Bible Camp Potential Reissuance #56651*, https://bit.ly/2XAWlMW (last visited May 28, 2020); *see also* Johnson, *Camp*, *supra* (reporting that members of the Cabin Owners Association at Columbine have "proposed to purchase the property and keep it open," hoping that "it will be busy all summer long").

59.     Upon information and belief, USFS and FWS have never engaged in formal consultation under Section 7(a)(2) of the ESA over the Camp's impacts on the Mount Graham red squirrel or its recovery.

**E.     The Center's April 13, 2018 Notice of Intent and USFS's Response**

60.     On April 13, 2018, the Center, on behalf of itself, Maricopa Audubon Society, and the Mount Graham Coalition, transmitted to the U.S. Secretaries of Interior and Agriculture, USFS, and FWS a notice of their intent to enforce the terms of the ESA. *See* Letter from Robin Silver, M.D., Co-Founder and Board Member, Center for Biological Diversity, to Sonny Perdue,

1    Secretary, U.S. Department of Agriculture, et al. (Apr. 13, 2018) ("NOI"). Specifically, the NOI

2    notified USFS and FWS that: (1) dramatic declines in Mount Graham red squirrel's rangewide

3    population, caused in part by the 2017 Frye Fire, and the species' relocation to lower elevations

4    required USFS and FWS to reinitiate consultation under Section 7(a)(2) of the ESA as to the

5    Special Use Permit for recreational residences in the Ash Creek drainage; (2) the red squirrel's

6    dangerously depleted population and predominant presence in the Ash Creek drainage required

7    USFS and FWS to engage in formal consultation under Section 7(a)(2) for the continued

8    existence, associated infrastructure, and use of the Camp; and (3) that sections 7(a)(1) of the

9    ESA, combined with the USFS and FWS's prior concessions regarding the importance of the

10   Ash Creek drainage to the red squirrel's survival, required USFS and FWS to remove the

11   structures at both the Camp and Old Columbine summer home tracts. *See* NOI at 16–28, 33. The

12   NOI therefore discharged Plaintiffs' jurisdictional duty under the ESA's citizen suit provision,

13   16 U.S.C. § 1540(g)(2).

14          61.    On June 27, 2018, USFS and FWS responded to the NOI. *See* Letter from Shawn

15   Sartorius, Acting Field Supervisor for Arizona, FWS, and Kerwin S. Dewberry, Forest

16   Supervisor, Coronado National Forest, USFS, to Robin Silver, M.D., Co-Founder and Board

17   Member, Center for Biological Diversity (July 27, 2018) ("2018 Response") at 1. The response

18   provided that "[b]oth [USFS] and [FWS] agree that re-initiation of consultation under Section 7

19   is needed at this time." According to USFS and FWS, "[s]urveys following the 2017 Frye Fire

20   indicate a decline in the population of the Mount Graham red squirrel and impacts to its

21   designated critical habitat," which constitutes "new information" not considered in the

22   Columbine BiOp. *Id.* Furthermore, the agencies' response indicated that USFS was then "in the

23   process of renewing the Special Use Permit for the Columbine recreational summer camp," i.e.,

1   the Camp, and that "[p]rior to re-authorizing this permit, [USFS] will consult with [FWS]." *Id.*

2   While outlining certain measures the agencies were pursuing to stabilize the red squirrel's

3   population in the wake of the Frye Fire, USFS and FWS indicated they were also "conducting on

4   the ground searches for new middens and GIS analyses and ground-truthing of remaining

5   habitat," as well as "collecting LiDAR data to determine remaining red squirrel habitat" and

6   "areas suitable for habitat enhancement . . . ." *Id.* at 2.[4]

7         62.     Having received assurances from USFS and FWS that they were then working

8   towards engaging in consultation required under the ESA, and preferring to avoid resorting to

9   judicial remedies, Plaintiffs opted to delay filing suit at the close of the 60-day window set forth

10   in 16 U.S.C. § 1540(g)(2). Today, however, nearly two years have passed since USFS and FWS

11   transmitted their 2018 Response. To date, the agencies have not completed consultation on either

12   the Camp or Old Columbine summer homes. Indeed, upon information and belief, USFS has not

13   even completed a biological assessment as to either location.

14         63.     On April 10, 2020, the Center transmitted a letter to USFS and FWS following up

15   on the representations made by the agencies in 2018. *See* Letter from Robin Silver, M.D., Co-

16   Founder and Board Member, Center for Biological Diversity, to Kerwin Dewberry, Forest

17   Supervisor, Coronado National Forest, USFS, et al. (April 10, 2020). In relevant part, the

18   Center's letter sought to obtain information about the agencies' proposed consultation plan and a

19   date certain by which the agencies would complete those processes. *Id.* at 4. That letter further

20   informed USFS and FWS that bifurcating consultation for the two locations at issue, the Camp

---

[4] LiDAR stands for "Light Detection and Ranging," a survey method which provides three-dimensional information about a target area, including forest structure and biomass data. LiDAR instruments typically include a laser, scanner, and GPS receiver attached to an airplane or helicopter. This survey method allows researchers to cover broad areas of terrain in a very short time period.

1   and the Old Columbine summer home tract, would be inappropriate in light of the red squirrel's

2   severely diminished population, the proximity of those two locations, their interconnection via

3   intact mixed conifer forest, and their shared importance for the species' recovery prospects. *Id.* at

4   3. To date, neither agency has responded to the Center's April 10, 2020 letter.

5   <u>**PLAINTIFFS' CLAIMS FOR RELIEF**</u>

6   **Claim I – USFS and FWS's Failure to Ensure the Camp's Structures Do Not Jeopardize**
7   **the Mount Graham Red Squirrel, or Inhibit Its Recovery, Violates the ESA**
8
9       64.     Plaintiffs hereby incorporate all preceding paragraphs by reference.

10      65.     Except in extraordinary circumstances not present here, the ESA mandates that

11  federal agencies, in consultation with FWS, "insure that any action authorized, funded, or carried

12  out by such agency . . . is not likely to jeopardize the continued existence of any endangered or

13  threatened species or result in the destruction or adverse modification of habitat of such species"

14  that has been determined to be "critical." 16 U.S.C. § 1536(a)(2). Accordingly, with respect to

15  every discretionary action undertaken by an agency, the ESA "requires that [the] agency 'insure'

16  that the actions it authorizes, funds, or carries out are not likely to jeopardize listed species or

17  their habitats." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666-67 (2007).

18      66.     By failing to engage in formal consultation to determine whether the Camp and its

19  associated infrastructure are jeopardizing the continued existence and/or inhibiting the recovery

20  of the Mount Graham red squirrel—an analysis that both USFS and FWS have conceded is

21  necessary—USFS is in violation of the ESA and its implementing regulations. The structures

22  associated with the Camp remain in the Ash Creek drainage without a valid Special Use Permit,

23  inhibiting restoration of the critical mixed conifer forest assemblages upon which the few

24  surviving red squirrels now rely. Although USFS and FWS have represented that formal

25  consultation over the Camp will occur someday, that mere assertion fails to recognize the

immediate threat of extinction that the species now faces, and cannot satisfy the agency's duty to avoid species jeopardy, as required by the ESA and its implementing regulations. The agencies' joint failure to engage in consultation is particularly notable because the forest in and around the Camp is essentially the only short-term recoverable surviving canopied habitat and is being considered by FWS for designation as Mount Graham red squirrel critical habitat. Accordingly, USFS's complete failure to insure, through formal consultation with FWS, that the Camp's structures and occupation of National Forest System lands are not jeopardizing the continued existence of the Mount Graham red squirrel, destroying its proposed critical habitat, and impairing its survival and recovery prospects, is arbitrary, capricious, and in contravention of Section 7(a)(2), 16 U.S.C. § 1536(a)(2), and the ESA's implementing regulations, 50 C.F.R. § 402.14(a).

67.     Alternatively, USFS's failure to engage in any form of consultation since the near-total collapse of the species' population in 2017 constitutes agency action that has been "unlawfully withheld or unreasonably delayed" in violation of 5 U.S.C. § 706(1).

**Claim II – USFS and FWS's Failure to Reinitiate Consultation Over
the Continued Operation of Recreational Summer Homes
on the Old Columbine Tract Violates the ESA**

68.     Plaintiffs hereby incorporate all preceding paragraphs by reference.

69.     Under 50 C.F.R. § 402.16, "[r]einitiation of consultation is required and shall be requested by the Federal agency or by [FWS], where discretionary Federal involvement or control over the action has been retained or is authorized by law," and where "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." Both USFS and FWS have conceded that this trigger was met with respect to the Columbine BiOp nearly three years ago in the wake of the Frye Fire. Whereas

the Columbine BiOp estimated that 199-346 individual red squirrels remained in the wild,

FWS's most recent population projection places that number below 80 individuals—a 61-78%

decline in the species' entire population. Furthermore, the Frye Fire's burn path and associated

flooding—in conjunction with decades of human development, prior wildfires, and insect

infestations—has effectively eradicated the species from its designated critical habitat, with the

few remaining individuals desperately needing all short-term surviving, canopied habitat in and

around the Columbine tract for survival and recovery. Thus, in 2018, USFS and FWS "agree[d]

that re-initiation of consultation under Section 7 [was] needed at this time." 2018 Response at 1.

Yet, both agencies continue to drag their feet and, upon information and belief, have not

completed even the preliminary phases of this legally required consultation. As with their failure

to examine the Camp's impacts on the Mount Graham red squirrel, USFS's and FWS's refusal to

reinitiate consultation as to the Old Columbine summer homes falls well short of those agencies'

duties to "'insure' that the actions [USFS] authorizes, funds, or carries out are not likely to

jeopardize listed species or their habitats." *Nat'l Ass'n of Home Builders*, 551 U.S. at 666–67.

70.     USFS has both "retained" and is "authorized by law" to engage in "discretionary

Federal involvement or control" of special uses of National Forest System lands, including the

use and occupation of the recreational summer homes at the Old Columbine tract. The Frye

Fire's decimation of the Mount Graham red squirrel population, its eradication of the red squirrel

from its critical habitat, and its forcing the remaining population to relocate to the areas in the

Ash Creek drainage (areas currently being considered by FWS for designation as critical habitat)

constitutes "new information [that] reveals effects of the action that may affect listed species or

critical habitat in a manner or to an extent not previously considered," 50 C.F.R. § 402.16.

Therefore, USFS and FWS must reinitiate consultation *prior* to allowing any further use and

1    occupancy of the summer home tracts, and FWS must timely produce a BiOp that fully addresses

2    all of the direct, indirect, and cumulative effects associated with USFS's activities.

3          71.    For these reasons, USFS and FWS have violated Section 7(a)(2) of the ESA, 16

4    U.S.C. § 1536(a)(2), and 50 C.F.R. §§ 402.14, 402.16, in failing to reinitiate formal consultation

5    prior to allowing the use and occupancy of the summer homes in the Ash Creek drainage, which

6    constitutes arbitrary and capricious agency action in violation of 5 U.S.C. § 706(2) or,

7    alternatively, constitutes agency action "unlawfully withheld or unreasonably delayed" in

8    violation of 5 U.S.C. § 706(1).

9    **Claim III – USFS's Failure to Adopt Conservation Recommendations Intended to**
10   **Ensure the Survival of the Mount Graham Red Squirrel Violates the ESA**
11
12         72.    Plaintiffs hereby incorporate all preceding paragraphs by reference.

13         73.    Section 7(a)(1) of the ESA imposes upon all federal agencies a substantive duty to

14   "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs

15   for the conservation of endangered species and threatened species . . . ." In this context,

16   "'[c]onservation' means to use *all* necessary methods and procedures to bring any endangered

17   species to the point at which conservation efforts are no longer necessary." *Center for Biological*

18   *Diversity v. Vilsack*, 276 F. Supp. 3d 1015, 1031 (D. Nev. 2017) (emphasis added) (citing 16

19   U.S.C. § 1532).

20         74.    By failing to implement a program that conserves the few remaining Mount

21   Graham red squirrels and, instead, authorizing actions in a manner that impairs the species'

22   recovery and pushes it closer to extinction, USFS has violated (and is violating) its substantive

23   duty under Section 7(a)(1). FWS has for decades stressed that removal of structures and

24   rehabilitation of the mixed conifer habitat in and around the Camp and Old Columbine summer

25   home tract is critical to the red squirrel's survival and recovery. In the wake of the Nuttall-

34

1    Gibson Complex Wildfire, FWS once again recognized that such actions are even more crucial.

2    *See* Nuttall-Gibson BiOp at 35. Following the unprecedented devastation wrought by the Frye

3    Fire, immediate habitat rehabilitation has become paramount to the red squirrel's fundamental

4    survival and recovery. Yet, structures remain at both locations, even in the absence of a Special

5    Use Permit for the Camp and its infrastructure. Despite acknowledging that the "[i]mmediate

6    removal of the [Old Columbine] residences, if policy permitted, would accelerate restoration of

7    the tract by 10 years," USFS has refused to remove those structures, stating that such action

8    would not be "in accordance with [USFS] special-use policy." Columbine FEIS at 258. Although

9    USFS has considered and/or implemented a series of temporary stop-gap measures to stabilize

10   the Mount Graham red squirrel, those programs do little to rehabilitate the populations in the

11   long term and will not, on their own, bring the "species to the point at which conservation efforts

12   are no longer necessary." *Vilsack*, 276 F. Supp. 3d at 1031 (citation omitted); *see also* 2018

13   Response (outlining "projects under development or in process," including winter feeding and

14   monitoring programs). Given the red squirrel's severely depleted population—every member of

15   which resides on land under USFS jurisdiction—the agency's citation to these ineffective actions

16   cannot suffice to demonstrate that the agency has developed, in consultation with FWS, a

17   program designed to meaningfully conserve the Mount Graham red squirrel and the last vestiges

18   of its habitat. Accordingly, USFS has violated the Section 7(a)(1) of the ESA, its implementing

19   regulations, and the APA.

20   **Claim IV – Absent Valid Authorization, the Camp's Occupation of National Forest**
21   **System Lands Violates USFS's Own Implementing Regulations**
22
23        75.    In administering National Forest System lands, USFS's enabling statutes require

24   that USFS balance the competing uses for outdoor recreation, range, timber, watershed, and

25   wildlife and fish purposes, and provide for multiple use and sustained yield of the various

1    products and services obtained from the lands within its jurisdiction. 16 U.S.C. §§ 475, 528, 529.

2    USFS's regulations ensure that unenumerated uses (i.e., special uses) of Forest System lands fit

3    within the balance prescribed by those statutes. Thus, USFS's implementing regulations mandate

4    that all special uses must comply with applicable federal environmental laws and regulations, 36

5    C.F.R. § 251.54(e)(1)(i)–(iii), that such use must be consistent with the public interest, *Id.* §

6    251.54(e)(5)(i)–(ii), and that the permit's terms must "[m]inimize damage to scenic and esthetic

7    values and fish and wildlife habitat and otherwise protect the environment." *Id.* § 251.56(a)(1)(i).

8        76.   Because the Special Use Permit for the Camp expired on December 31, 2008, and

9    because the structures associated with the now-defunct Camp continue to occupy National Forest

10   System lands—without a valid permit—USFS has failed to comply with its own regulations that

11   require the agency to adopt for all activities subject to Special Use Permits "[t]erms and

12   conditions which will . . . [m]inimize damage to scenic and esthetic values and fish and wildlife

13   habitat and otherwise protect the environment." 36 C.F.R. § 251.56(a)(1)(i)(B). The need for

14   rigorous Special Use Permit terms and conditions has grown even more imperative in light of the

15   Mount Graham red squirrel's now severely diminished population and the presence of mixed

16   conifer assemblages—habitat that FWS has deemed essential to the species' survival—precisely

17   where the Camp and its facilities are located.

18       77.   USFS's failure to satisfy its own regulations is arbitrary, capricious, contrary to

19   law, and an abuse of discretion, *see* 5 U.S.C. § 706(2), and, alternatively, is agency action that

20   has been unlawfully withheld or unreasonably delayed, *see id.* § 706(1).

21

22

23

1      **PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

3          (1)     Declaring that Defendants have violated the Endangered Species Act, the Organic

4      Act of 1897, the Multiple-Use and Sustainable Yield Act, the National Forest Management Act,

5      and the Administrative Procedure Act;

6          (2)     Enjoining USFS from authorizing continued use and occupation of the Old

7      Columbine summer home tract, including "any irreversible or irretrievable commitment of

8      resources with respect to" that action in violation of 16 U.S.C. § 1536(d), until consultation has

9      been reinitiated and completed;

10         (3)     Enjoining the use and occupation of the Camp tract, including "any irreversible or

11     irretrievable commitment of resources with respect to" that action in violation of 16 U.S.C. §

12     1536(d), until consultation has been initiated and completed, and a valid Special Use Permit has

13     been issued;

14         (4)     Setting aside the Columbine ROD, and the Columbine BiOp upon which it relies,

15     and remanding to USFS and FWS with instructions to immediately reinitiate consultation to

16     address the impacts of its infrastructure, use, and operation;

17         (5)     Remanding to USFS and FWS with instructions to immediately engage in formal

18     consultation for the Camp tract to address the impacts of the Camp and its infrastructure;

19         (6)     Ordering USFS and FWS to complete consultation as to both the Camp and Old

20     Columbine tract by a date certain;

21         (7)     Ordering USFS to develop an appropriate conservation program pursuant to

22     Section 7(a)(1) of the ESA to include the immediate removal of man-made infrastructure and

23     restoration of the Ash Creek drainage;

37

(8)   Awarding Plaintiffs their attorneys' fees and costs in this action; and

(9)   Granting Plaintiffs any further relief as the Court may deem just and proper.

Respectfully submitted this 10th day of June, 2020.

/s/ William S. Eubanks II
WILLIAM S. EUBANKS II
(Admission *pro hac vice* pending)
EUBANKS & ASSOCIATES, LLC
1331 H Street, NW, Suite 902
Washington, DC 20005
Phone: (970) 703-6060
bill@eubankslegal.com

/s/ Matthew R. Arnold
MATTHEW R. ARNOLD
(Admission *pro hac vice* pending)
EUBANKS & ASSOCIATES, LLC
1331 H Street, NW, Suite 902
Washington, DC 20005
Phone: (843) 718-4513
matt@eubankslegal.com

/s/ William N. Lawton
WILLIAM N. LAWTON
(Admission *pro hac vice* pending)
EUBANKS & ASSOCIATES, LLC
1331 H Street, NW, Suite 902
Washington, DC 20005
Phone: (202) 556-1243
nick@eubankslegal.com